Before we begin, I want to welcome our many visitors from Taiwan. We are very pleased that you are here. The first case this morning is number 08-1365 Resqnet.com v. Lansa. Mr. Kaplan from Kaplan, Gilman & Pergamon. Your Honor, turning first to the timing issue of the Rule 11 notice, it bears emphasizing that if you review page 57 of Lansa's red brief, they rely exclusively and only upon the 2001 notice letter. There is no argument or allegation that any other proper notice was served by that. Therefore, the issue before the Court on the notice is narrow. Namely, is that 2001 notice letter that they rely on sufficient? But beyond the timing of the notice, at pages 22-23 of our opening brief, we set forth a whole bunch of cases that said that independent of the notice, the mere fact that they waited three years to file it, itself renders the motion untimely. And in furtherance of that, recall that the entire conduct for which sanctions were awarded was prior to the appeal when the case came up to this Court previously. We had a final stipulated judgment of non-infringement. They prevailed on all the claims in 2002. We then came up to this Court and appealed the Markman because we lost, and this Court reversed in part and remanded. Now that was fortuitous for our side, but this Court could just as well have said we affirmed the trial judge and the case would have been over. Well, they certainly couldn't have at that point gone back to Judge Sweet in the trial court in the end of 2003 and said, that case that you entered final judgment on a year and a half ago, the Federal Circuit's now affirmed it, and you know, trial court, we'd like to make a new motion now. That would have been waived and way too late, and likely there would be no jurisdiction. But the Rule 11 notice isn't untimely as to the 608 patent which was still being litigated, was it? Yes, it was. Even at that case, you're saying because they relied on the letter that was three years earlier, it's still untimely? It's still, well, for more than that reason. It's untimely also because when they served it, it was a different factual record. It was a reassertion of that patent afterwards, and in fact, in addition to all the cases we cited at page 22 to 23 of our brief that said that the motion cannot be served so many years late, there's an additional case called Schaeffer Salt Recovery that's reported at 542 F. 3rd 90, and a follow-on case to that called Langer, which is at 1995 Westlaw 395937, and these cases deal specifically with the issue of when you have an appeal and then a remand, and then you move for sanctions after the remand on conduct that occurred before the final judgment, and the problem is it creates piecemeal litigation because the first appeal, all the conduct was before that, and the first appeal should have dealt with that. It's the same reason why this hearing, come up on appeal, go back down on a reversed claim construction, and then come back up and appeal the first market. The problem is that by the time they made the motion on either of the patents, we had a different record, and we had reasserted it on a different claim construction, and there was no more offending, pleading on file. I want to switch it to damages. 12.5 percent royalty rate in a patent dealing with computer technology where the royalty rates are generally in the 1 to 1.5 percent range, and it's based on five licenses that have nothing to do with the patented technology. How can Dr. David have been allowed to testify, let alone wind up with a 12.5 percent royalty? Your Honor, the issue of the license agreements being entered into unsettlement discussions was never raised below. They filed an entire motion in limine to preclude his testimony. They never raised that in the entire motion. Okay, well, fine. He got a chance to testify, which that's the district judge's call, but how do you justify a 12.5 percent rate? What Dr. David went through is an entire analysis of profit margin. I got it. The IBM license, 45 percent. Hummingbird license, up to 25 percent after 75K up front payment. Crystal Point, up to 30 percent. ICOM, up to 25 percent. Ericcom, up to 40 percent. None of those five have anything to do with the patented technology. They're not even patented. They're software bundling. No, they embody the software issue. They're questions of use of a particular product. They're not a patent license. The patent licenses are down in the five range, the two that he brings up, and I think those are high. And that's why, Your Honor, he came when he evaluated that. But I'm asking you what's the basis for even considering, allowing consideration of those five licenses in the 40 percent range? Well, he discounted them. When you read his report, he says they're improper. I read it very carefully. He discounted it and still used it to recommend the range which was adopted by the district court verbatim. Your Honor, I mean, with due respect, Your Honor, I would disagree with the apparent weight that Your Honor seems to be placing on how Dr. David considered those. He was questioned about that. To have considered them at all is very questionable. But even at that, the other two are five percent range, which again strikes me as inordinately high. Your Honor, not in this field. I mean, there's an entire analysis in his report. There's a lot of value added by this. There's a lot of efficiency. IBM is licensed under these. Well, what was the link of any of these to the claimed invention? They all embody the claimed invention. They all embody Amongst a thousand other things. Was there any effort to factor out that license for the specific claimed invention? Is there anything that links this license to that technology and nothing more? Which is all you've got damages coming for anyway. That's the Siegel license and the Zephyr and there are some other ones. And those are in the five percent range. So those are the only ones that bear it all on the consideration and they are at least half of what you got. So I'm still struggling vastly to say. I think there's an analysis in there of profits. There's a starting point. And I don't think Dr. David did anything more with those high licenses other than say they're too high. Well, somehow he got from just using the Zephyr, which is the five percent license, he got almost triple that. The only way he gets triple that is by referring to these 40 percent licenses, which we all agree embody vast amounts of technology beyond the claimed invention. That's correct. It's like trying to patent on the tire and you're getting damages on the whole Cadillac, right? I just don't think he used it in that way, Your Honor, but the report says what it says. So I can't answer. I read it. And you can't deny that the only possible link to the claimed invention is in the five percent range, which still strikes me as high. But there's nothing, there's no link between the claimed invention and a 12 percent range, is there? Your Honor, just what's in the report. Thank you. If I could move on, continuing with the Rule 11 on the merits, the issue on the merits of the Rule 11 is whether we should have accepted at face value what their settlement correspondence said or not. We chose to do is to test it in discovery and then remove the claim where they were right. But keep in mind that all those cases we cited in our brief about how it would have been unreasonable for me to drop the case or when parties tried to then bring it back by claiming they relied on their adversary. Had we dropped the case in December of 2001 and tried to bring it back when we got discovery, Lanza would have been citing all of those cases to the trial judge saying they had this patent in the case, they then took it out, now they want to put it back and they're trying to tell you that they took it out simply because of what their adversary told you, told him, and that's unreasonable as a matter of law. That's what happened in the Phoenix oil case that we cited. The plaintiff took it out as a result of settlement correspondence. He then went back to the court and said, we've now found that that was incomplete, it omitted stuff, it was untrue, and they tried to put it back. And the court said you had no right to rely on what he told you. You should have taken discovery. We took the discovery, removed it as soon as it verified what he was saying. Finally, on the Rule 11, bear in mind not only are there these cases that talk about how it would have been unreasonable to rely on everything he was saying as correct, but now after trial most of what was in that 2001 notice letter has been deemed by the court to be incorrect. The idea that we don't use fields to identify screens, it was incorrect. So the course of action taken here, this is not a situation where we closed our eyes and went on for years and years litigating a meritless case. We said, we see what you're saying. Based on what you're saying, we think you're right. The second or third page of the letter even says we disagree with some, we agree, but it's not productive to discuss that. Let's turn to your letter. Based on his letter, we verified what he said and then we dropped the case. So we don't think that that's unreasonable course of conduct. Moving to the merits of the 07-5 infringement claim, the dispute on the 07-5 strikes us as largely one of nomenclature and not substance. Both sides seem to agree on what the trial court found the New Look software does. It takes the screen, it goes place by place, check this place, check this place, check this place. When it finds the proper trigger text that it's looking for, the proper bit pattern, let's say if it finds it the third one it checks, it recognizes what that is and then it says, okay, now I've got to apply these graphical user overrides. You can characterize that process as Lanza does by saying we just look for a particular field and we apply an override to that field, that's the way they name it. Or you can characterize that process as saying when I extract the right bit pattern after processing the screen and looking at that place, I have a bit pattern that if I recognize the third one, that's the proper screen ID and I apply graphical user interface number three. You're just describing the same thing two different ways. The analogy we used in the trial court is a law firm wants to deliver a package here to Judge Lorry. They could tell the messenger go to courtroom 201 and the way you'll recognize Judge Lorry is he'll be the judge in the front with the judicial robe on the left. That's how you recognize him. What Lanza is saying is they don't do that. They tell the messenger go to courtroom 201, you don't need to recognize anyone, just deliver the package to everyone who's sitting in the front of the courtroom with the judicial robe on the left side. So they're just preordaining. Again, it's two ways of just describing the same thing, but there's no dispute about what the methodology does and there's no disclaimer in our patent that says pulling bit patterns out of the screen ID is somehow disclaimed or excluded from coverage. The final point on the 608 patent, Your Honor, is with respect to the two limitations found to be not present in the New Look software, one was the screen by screen variability of the function keys and that was not found absent from the New Look enabled terminal. It was just that the trial court found that it was attributable to some other software in that terminal. That's in the trial court's opinion. As to the absence of the ability to identify users logging in, Lanza's brief in this case agrees that that's in the New Look enabled terminal. They're just saying it comes from some other part of some software that's in there. It's not in New Look. Now while we disagree with some of those fact findings and that's in our briefs, the point is in an inducement claim, if the resulting terminal with their software winds up having everything in the claim as a result of them putting their software in the inducement claim, it doesn't matter that some of the other stuff was not supplied by them. And we've cited cases that said that. The error there was because the judge in the trial court analyzed only our direct infringement claim. So unless the panel has any other questions, I'd like to save the rest of my time that I have for rebuttal. Okay, any questions? Thank you, Mr. Kaplan. Thank you. Mr. Helton. May it please the court, James Hume for the defendant Lanza. I'd like to reserve five minutes of my time for my rebuttal, if I may. There are two points I'd like to make initially. One, and I think the court needs to keep this in mind in looking at the record here, Rescunet never downloaded and tested the New Look software. They didn't do it before filing the lawsuit. Their expert didn't do it. But you're talking the sanctions now, aren't you? No, I'm talking about the merits of the case, because when you look at the evidence that Rescunet has put forward about the operation of the New Look software, it is not based on the software itself, but it's based on Rescunet's interpretation of what the documents say about the software. And that's not what the test is here. The test is what the software actually does, not what the documents say it does. So the only witnesses that you have who actually operated the software are the ones from Lanza or from the New Look party in Australia. But are you saying that you came forward with evidence that what it does is different from what it says it does? Well, the evidence is that what it does is different from what Rescunet claimed, the documents that it does. What you have here on the Rescunet claim is an interpretation. That's why I said you showed that it was different. We did show it's different. And I would refer to the extensive testimony of Mr. Kay, one of the inventors of the New Look software. He explained that it is not recognizing screens, that it's rendering elements on the screen. You're saying that was undisputed by the other side? They had no basis to contest that, because they had no one who had actually looked at the software and could say the software does what I asked. I asked if they disputed it. Well, they tried to cross-examine them, and they dispute it based on the documents. They don't dispute it based on the operation of the software. And in fact, Dr. Dowling, who is Rescunet's expert, had never even worked with an AS-400, which is the platform this software works on, the IBM platform. He didn't even know what a login screen for an AS-400 looked like. He had never used the software on the platform it was intended to. I think they've taken... You're saying that the trial court clearly erred? What I'm saying is that when you keep in mind what they've said here on appeal in their briefs as to what the New Look software does, it's not actually based on what the software does, it's based on what they interpret the documents being. I think the court did commit an error, but it was more of a legal error, which I'll get to when I talk about the 075 patent. What about the sanctions? The inability to utilize the state private provision because the motion was filed late? Your Honor, I don't think it was, and I think you need to look at Mr. Kaplan's letter, which appears at 625. Well, but the 127 patent is already out of the litigation for a long time when you filed the motion. It had been out, but we had costs. But what Mr. Kaplan said in his letter was, and this is at 626, we accept your Rule 11 notice from the first meeting we had. There is no need to raise the issue again. If you have a valid claim under Rule 11, please bring the motion. No further threats are warranted, unless there... But they say at the outset, unless we discover evidence to the contrary. Right, and... Presuming we discover no contrary evidence, and in fact they did. Well, no... We found enough evidence to prove infringement. Actually, that's what happened was the letter was sent. There was no further evidence. They've identified nothing, and they filed an amended complaint. I knew pleading that repeated the 127 and the 608 allegations and added the 075. And based on the letter, they said if we don't have any further evidence, we'll dismiss it. In fact, they did the opposite. Without any further evidence, they filed the amended complaint against us, repeating these claims that they said we did not infringe. And when the discovery came forward, they had enough to prove infringement. Well, they dismissed the 127 and... Yes, which makes you wonder why they have... There's any basis for that. We don't think they ever had enough to prove infringement of 608. We ultimately prevail on that at trial. Although the district court does deny summary judgment. He thinks it's a close enough call that it goes to trial. Right. He denied summary judgment based... So on a close call, it goes to trial once they get all the evidence out. And they, at the outset, said we're not going to dismiss until we've had a chance for discovery. Where's the Rule 11 frivolousness and vast abuse? Because RescueNet filed a pleading with claims that it knew at the time did not infringe based on its own admission in September of 2001. There was no discovery in that period. It's identified... It knew at the time when the whole thing, when it survived the summary judgment motion? Well, that was years later. Of course, we had moved... Yes, once they'd had a chance for discovery. I'm struggling to find the vast abuse of procedure here. I think the vast abuse is you have a party admitting that it has no basis to assert infringement and it goes ahead and files a pleading that alleges infringement. Under this court's teaching, that's inappropriate. And in fact, we thought the four and a half hours that was spent prior to filing the suit, that was it. Not downloading the software was sanctionable on its own. Judge Sweet disagreed with us. You spent a lot of time doing that at trial. Did you spend any time challenging their damages? Why does David get to testify about these five licenses? We didn't think he should. We filed a Dalbert motion on him or a motion to eliminate or exclude that that was argued at trial. And then we were left with having to cross-examine him based on that. You didn't have your own damages? We did not have our own damages expert. And we made that decision based on our analysis of the potential liability and the damages here. In fact, that really is the issue I'd like to talk about, what the court did with the 075, because I think it's critical. After this court rendered its opinion in 2003, Judge Sweet then wrote an opinion in 2005 in which he went into the first time to the 075 file history, which was not before this court in 2003. And in a 12-page opinion that appears at 374, or 12 pages of his opinion, he reviewed that file history. And I think it's critical here because this patent, the 075, was rejected three times. And it was on the third rejection that RescueNet added what we think is the critical language. And what they said in the process of doing that is critical. It appears at 1676 of the extract, if I can read that. In explaining the amendments that they added, and it's the language we're relying on here, they said, the amendment to the claims has added limitations directed to a selection of a GUI screen that may be customized in the circumstances that the screen received from the host matches one of a plurality of screen-identifying information, or alternatively may be a default GUI screen if the received screen from the host does not so match. This unique limitation derives from the specification at page 7, line 23, which is now at A98 as the patent appeared. And what that reference specification states is the screen of information, this is at A98, and it's in column 4. The screen of information is then placed into a presentation space of operation box 206 and is recognized using a screen recognition procedure at block 207. The particular screen recognition algorithm used is not critical to the present invention, but may be of the type described in the 961 patent. After the screen is recognized and a screen ID is generated, the decision .28 determines whether or not such screen is contained in the screen table at the server. So in response to what the examiner said, where Rescunet was trying to argue, we can recognize the screen ID coming down from the host, and the examiner said, you can't do that, that's in the prior art, that's IHARA. They specifically amended the claims and referenced the specification that says they're using an algorithm to generate a unique screen ID. So based on that, in his- that's not critical. Actually, this court in 2003 said an algorithm is required, it doesn't have to be of the type used in the 961. But as I say, you didn't have a file history before you. When you get into the file history, you'll see that Rescunet specifically referenced the algorithm that generates a unique screen ID based on the information downloaded. And therefore, Judge Sweet, in his 2005 opinion held, claim one, and in particular the matching process claimed therein, are to be construed to require use of an algorithm that generates screen IDs. A year later, in 2006, in another decision- Let's stay on that. Yes. Obviously it requires an algorithm. Yes. I'm trying to understand now you're telling us that the algorithm is critical, when the specification, what you just read, said it is not. Obviously you need an algorithm which will perform the required steps. Right. And the algorithm must generate a screen ID, unique screen ID, according to what Rescunet told the examiner. They said they were amending the claim, putting in the language that now appears in the 075, where it's referring to a plurality of screen identifying information. And they specifically said this unique limitation derives from the specification that references then the algorithm that generates a unique screen ID. And in fact, that was what Judge Sweet found in his 2005 ruling in his 12 pages, where he exhaustively reviewed the file history and found that for the 075 patent, it requires a algorithm that generates screen IDs. And in 2006, he repeated that under the method specified by claim one of the 075 patent, the PC employs an algorithm to generate the unique screen ID for each screen information downloaded from the mainframe. Now, lest there be any doubt about this, at trial, this Dr. Dowling confirmed that claim construction, that Rescunet's own expert, where he said that he agreed the screen recognition algorithm of the 075 patent generates unique screen identification numbers to identify green screens. So what is the error? The error is when we come to 2008, what the court did then is in its merits decision in early 2008, it no longer required the algorithm to generate a unique screen ID. And in fact, the court merely said it was an algorithm that would have screen identifying information, but did not generate the, require the generation of unique screen ID. And I think this is highlighted in two sections of the record. If you look at the 2008 opinion, what Judge Sweet said in footnote three, this is 825, the identify tool, and that's the precise part of the new look software that he found to infringe where a developer can tag part of text. He said in footnote three, the identify tool does not assign each green screen a unique number or screen ID as defined in Rescunet one. We move to reconsideration. And in describing that precise part of his earlier ruling, he said, after reciting the fifth and six elements, this is at 8458 of the claim, the court described how new looks identify function uses an algorithm to generate a screen ID from trigger text in the incoming screen. So in his merits decision, he says, new look does not generate a screen ID from an algorithm. And then in his reconsideration, he said that he did, and there's no evidence of that. I say the evidence was replete, and the court's factual finding was correct. The district court at page 24 of its opinion says, the evidence demonstrates that the makers of new look encouraged developers to use the identify tool as a way of uniquely identifying a screen. District court didn't abandon that construction. Well, that was a way, but they're not, it's actually not uniquely identifying a screen. It's identifying unique text. And it doesn't, as Mr. K explained, it doesn't care what screen it's on. It's uniquely identifying that text, but that's not tied to any particular screen. For example, if you have XYZ company, the developer may tag that and say, okay, every time XYZ company appears on a screen, put the XYZ logo in the lower right-hand corner. Now that doesn't care what screen it's on. That's not identifying that screen. That may be on one screen. It may be on every screen. It may be on half the screens. And that's what the court was talking about there. And in his specific findings, he said, new look does not use an algorithm to generate a screen ID. And then when he issued his opinion, he changed what the claim construction was. When we pointed it out, he found that we did with, there's no evidence of that. I urge the court to look at Mr. K's testimony on that. Now, Mr. Newman, you'd save some time for rebuttal on the cross-appeal. Yes. And I guess I will submit on the damages and the 608 issues if I may reserve my time. Thank you. Mr. Kaplan. Your Honor, first of all, the quote that was cited to our letter, presuming we discover no evidence to the contrary in September of 01, and then Mr. Hume said, you went ahead without that evidence. And I think my time was set. I expanded it to three minutes. It was five minutes. I'm sorry. Of which a certain amount was exhausted, but not of which I was exhausted. We need to explore these issues. Okay. Thank you, Your Honor. When we said in the letter, presuming we discover no evidence to the contrary as the case moves forward, they're taking that to say that in September you said that, and you didn't discover anything, and then you filed the amended complaint in December. But we were saying, presuming we discover no evidence to the contrary as the case moves forward, meaning, presuming we take discovery, we discover no evidence to the contrary. Recall, Your Honors, the only reason there was any amended complaint filed at all in December was because another patent unrelated to the Rule 11 sanction issued in the interim in November or October, I forget, and we had to add it. Absent that other unrelated patent issuing, the same original complaint with the same 608 would be in there, and when we discovered the evidence to the contrary, we wouldn't have taken it out. We weren't saying we're going to take it out now. It specifically says, as the case moves forward, forgive me, I'm sorry. We understand that in reading it, your opponents have a tendency to elide that. I'm sorry, I interrupted you, Your Honor. Please continue. Can I take you back to damages? Okay. I'm going to address that, Your Honor. May I just address one point with that? That may answer your question a bit. Go ahead. With regard to these bundled licenses that included other items, one thing I've neglected to mention before was that in the trial court, we also had a license that showed a very small percent royalty. I think it was 2 or 3 percent that also included bundled software, and Lanza extensively argued that that license agreement was the relevant one that should set the royalty rate and that the trial judge should rely upon that one, and that's throughout the record. I don't have the site now, but I could send it, and so I would suggest that if they went into the trial court and themselves argued that a software license with bundled software related to other stuff is the one that should govern, they should not be permitted to appeal on the ground that it was improper for the judge to consider, for the judge to admit testimony that also considered other licenses with the same property, Your Honor. Okay. Well, we all know we're only looking at the claimed invention, so anything which expands beyond that needs to be discounted significantly. But isn't there a more fundamental problem? The district court specifically says in its judgment that it's choosing this higher rate because the patents have been adjudicated as valid and infringed. Now, isn't that legally erroneous methodology? Because the hypothetical negotiation is supposed to take place at a time before there's any adjudication. Isn't that right? So isn't there an error in timing which vastly skews the... I don't think so, Your Honor, because I think, and again, I don't have the sites handy, but I'm virtually certain there are many cases out of this court that say that once the patents are adjudicated valid and infringed, i.e., in this trial, that the infringer does not get the benefit of what would have happened... But you're setting the reasonable royalty rate at a hypothetical time before the infringement occurs, which means there is no adjudication, validity wouldn't necessarily be a part of the pending question that the hypothetical negotiation would have to consider as open. And I believe that's correct, but not inconsistent with this Court's case law that says that you can consider the fact that the patents have been held valid and infringed, and I can find those cases with your permission and send in two or three of them in the next... I'm sure I've seen cases, or at least I'm virtually sure I've seen cases out of this court that say that. I've written lots of books on this issue. I haven't found that case. Your Honor, if I could just make two other points of rebuttal on the Rule 11. The letter also that Mr. Hugh read where it says we accept your notice from the beginning, we did. And the notice from the beginning, from the day we filed the lawsuit, not only in these letters, but repeatedly, they kept telling us that we violated Rule 11 because they don't identify screens. So yes, we did accept that notice, and we did tell them if you think it's a Rule 11 for us to say you identify screens when your literature says make sure the screen's identified, go file your motion. That wasn't telling them, you know, you don't have to serve notice for some other violation that is going to occur, you know, months from now. So the 2001 notice letter and all that correspondence relates entirely to issues that they were claiming violated Rule 11, but which they lost on the notice that Rule 11 was denied, they lost on the merits. So the judgment to tell them go ahead and file your Rule 11 motion, we accept your notice, was perfectly appropriate. Your Honor, the only other issue I want to point out about the letter is that the letter specifically states, the second or third page of it, that it's just addressing their characterization of it, and it says it's not productive, we're not going to dispute you where we disagree, let's turn to your eight-step process that you described, and it goes through that. We had four patents, we were trying to settle the suit, we told them we think you're going to be correct on these two, we'll take discovery, we'll remove them, but you still should settle with us because we're going to have two other patents. That's all that was going on there, and we never understood, you know, from the beginning why there was anything inappropriate about that, particularly since if we had dismissed the stuff in December, we would have been precluded from litigating a claim that the trial court himself found was properly brought, based on a settlement letter. Thank you, Your Honor, unless you have any questions. Yes, thank you, Mr. Kessler. Mr. Hume. Thank you, Your Honor. Judge Lloyd, I asked you a question about Mr. David. Docket number 187, which appears in the appendix at A84, the docket entry does, was a motion we filed to strike and exclude the testimony of Mr. David. A84 is part of the docket sheet, and you'll see at 187, docket entry 187 was a motion that lands a file to strike the expert report and preclude the testimony of Mr. David at trial. So we certainly did challenge him before trial, as well a month before trial, as to his ability to testify. What I'd like to do is go back to the 075, because I think it's critical that this court... Well, this is pure rebuttal. Yes, Your Honor, and it is rebuttal to that. I just wanted to point out that I think that on the 075 that it's clear that the proper interpretation is that an algorithm has to generate a screen ID, and Judge Sweet found a number of times that we did not. In terms of the Rule 11 ruling, I think that... I'm sorry, that's not rebuttal, but 075 is rebuttal, and that's what I wanted to address. If you look at Judge Sweet's merits opinion, what he said in footnote number one is, the new look screen ID is actually a search string chosen by the developer, not an output of an algorithm designed to identify unique screens. And that's one of the confusions here that RescueNet has seized on. New Look uses the term screen ID in its literature, but it's not the screen ID of the RescueNet patents, as Judge Sweet has identified here. The screen ID, and even Dr. Dowling confirmed, the new look screen ID is the input into the algorithm, it's not the output. And in fact, if you look at the New Look literature, you won't see the word output anywhere. We do not deal in a unique screen ID, as Judge Sweet did properly find. When a developer tags a part of screen, even if they're encouraging developers to uniquely identify a screen, that is not using an algorithm that generates a unique screen ID. That's using an input into the algorithm, and that doesn't violate the 075 patent. So we think when the court... We're in rebuttal. Yes, Your Honor. And what are you rebutting? I'm rebutting, I thought Mr. Kappman had briefly talked about the 075 during his argument, if I wasn't mistaken there. And I just wanted to make that point clear. I really will submit on the damages. I think that our brief adequately shows how Mr. David's opinion was woefully deficient and should not have been received in the first place by the District Court on a number of bases. That's not rebuttal? Excuse me, Your Honor? I'm looking at the issues of your cross appeal and the areas in which you have raised issues uncrossed that require rebuttal. Right. And that was primarily the 075 was the main issue in our cross appeal that I wanted to get forward. And we would ask this court to reverse the finding of infringement of the 075 patent. When you look at Judge Sweet's 2005 decision, we think you'll find that he had the proper claim construction there. And at a minimum, we think a new trial would be required where the rules are known in advance. Because when this trial was held in 2007, all of the parties, and in fact, Dr. Dowd, were under the impression that the 075 required an algorithm that generated unique screen ID. And the decision issued after that doesn't. So we think that at a minimum, there should be a new trial on that. We would ask the court also to vacate the award of royalty damages, to order judgment for Lanza, and actually to increase the amount of relevant sanctions. Thank you, Your Honor. Thank you, Mr. Hume. Thank you, Mr. Kaplan. Case is taken under submission.